IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| SYMANTEC CORPORATION, a Delaware corporation; and QUARTERDECK CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 02-406-KI |
| vs. | ) ) | FINDINGS AND CONCLUSIONS |
| CD MICRO, INC. an Oregon corporation, and VINCENT L. WEBB, an individual, | ) ) ) ) | |
| Defendants. | ) ) | |
| RONALD STICKA, US BANKRUPTCY TRUSTEE FOR THE BANKRUPT ESTATE OF CD MICRO, INC., | ) ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| vs. | ) ) | |
| OPTIMAX, a corporation having a principal place of business in Walnut, CA; STARGATE SOFTWARE, IINC., a corporation having a | ) ) ) | |

| principal place of business in Huntington Valley, | ) |
| PA; UNIK ASSOCIATES, LLC, a limited liability | ) |
| corporation having a principal place of business | ) |
| in Wauwatosa, WI; ALCHEMY COMPUTER, | ) |
| INC., a corporation dba GLOBAL ONLINE | ) |
| DEALS 4 ALL, and, PERFECTION COM, INC. | ) |
| a corporation dba GLOBAL ONLINE DEALS 4 | ) |
| ALL, both having a principal place of business in | ) |
| Murfreesboro, TN; and SOFTSHOP INCORP- | ) |
| ORATED, an Oregon corporation, | ) |
| | ) |
| Third-Party Defendants. | ) |
| | ) |

KING, Judge:

This action concerns the sale of counterfeit software which contained copyrights and trademarks owned by Symantec Corp. or Quarterdeck Corp. (collectively, "Symantec"). I previously entered a judgment against CD Micro, Inc., and in favor of Symantec for CD Micro's sale of the software. CD Micro bought some of the disks from Unik Associates, LLC ("Unik"). CD Micro filed third party claims against Unik and Symantec also sued Unik. I held a court trial in these consolidated cases to determine the remaining issues that were not resolved either through summary judgment or stipulation by the parties. The following are my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

As a preliminary matter, I reviewed the parties' objections to portions of the deposition testimony and deny all objections.

Symantec's software products include Norton SystemWorks® 2001 Professional Edition, Norton SystemWorks® 2002 Professional Edition, and Norton SystemWorks® 2003 Professional Edition which are suites of six separate software products. Unik sold 117,273 copies of

Symantec's SystemWorks® software from December 2000 through October 2003. The disks Unik sold contained six trademarks owned by Symantec: SYMANTEC, NORTON SYSTEMWORKS, NORTON ANTIVIRUS, NORTON UTILITIES, NORTON GHOST, and CLEANSWEEP. Symantec Corporation owns the copyrights for Norton Antivirus®, Norton Utilities®, Norton Ghost®, and Cleansweep®. The disks Unik sold contained all four of the copyrighted software products.

Unik sold SystemWorks® software to resellers and advertised through trade magazines, telephone marketing, email marketing, and direct mailings. Kishan Bagadia is the president and owner of Unik, a small company which had no more than four employees at any time in the last four years. Bagadia transitioned Unik into software wholesaling in 1993. Bagadia believed, and told his customers, that he was selling "good products" and legitimate, authorized software.

When a customer contacted Unik to purchase SystemWorks®, Bagadia located a supplier, requested a sample disk, and performed a cursory inspection to insure that it appeared to be a genuine product. Bagadia then forwarded the sample to the customer for inspection and approval. After receiving the customer's approval, Unik ordered the entire shipment from its supplier and delivered the order to the customer.

Some of the invoices Unik received from its suppliers described the software purchased using Symantec's product names, such as "NORTON SYSTEM WORKS 2001 PRO OEM." Ex. 24 at UA000108. Other invoices used generic terms, such as "SWP," presumably meaning software product. Ex. 24 at UA000116. Others used codes that only suggest Symantec's product names, such as "SystWorks." Ex. 24 at UA000133.

Unik never contacted anyone at Symantec to confirm the authenticity of the SystemWorks® products that it distributed. Unik also did not purchase a SystemWorks® product at retail and compare it to the disks it was selling.

When Vince Webb, president of CD Micro, spoke to Bagadia to order SystemWorks®, Webb specified that he expected to see certain characters on the hub ring indicating the manufacturer of the disk. Webb specified that there would be particular letters and numbers with a bar code in the middle of the sequence. Bagadia also questioned Webb about the indemnification language contained on CD Micro's form purchase order. Webb told Bagadia that the language was standard procedure and that he should not worry and just sign it.

Although Webb denies that he gave the specification to Bagadia or discussed the indemnification language, I find that his denial is not credible based on the demeanor of the two witnesses. Moreover, Webb testified that if a vendor would not sign the CD Micro purchase order statement containing the indemnification language, CD Micro would not buy software from them. Evidence filed as part of the summary judgment record, and noted in my Opinion dated February 24, 2005, at page 7, shows that Bagadia signed two CD Micro purchase orders but did not sign three others. Consequently, I decline to accept Webb's memory of the transactions. Bagadia sent disks conforming to Webb's specification.

In February 2002, Webb and Douglas Spletter, CD Micro's general counsel, traveled to speak to Steve Daniel, founder of TwinSoft, a CD replicator. Daniel examined the disk samples Webb and Spletter brought and concluded that the disks were replicated by replicators whose codes were printed on them. Webb knew that two of those replicators were not authorized but he thought that they took overflow work from the authorized replicators. Webb also checked his

disks against a retail copy of SystemWorks®. CD Micro stopped selling SystemWorks® a few weeks after it was contacted by Symantec.

In May 2002, CD Micro brought a third-party claim against Unik seeking indemnification for damages awarded against it. Bagadia read the pleading. After Unik learned of the suit, it sold 49,910 copies of SystemWorks® and continued to advertise the SystemWorks® product. A former CD Micro employee, Geoff Clay, told Bagadia that Unik's software was authentic and that CD Micro obtained the counterfeit software from other suppliers.

Unik's sales of SystemWorks® software accounted for approximately 20% of its total revenues for the years 2001 through 2003. Symantec and Unik stipulated that Symantec's actual damages from Unik's sales of the copies of SystemWorks® software total $272,226.

The court previously found that CD Micro sold approximately 231,100 unauthorized copies of Symantec products. CD Micro purchased 26,437 of the disks from Unik for $139,806.50. The court awarded Symantec treble damages of $10,003,605, attorney fees of $600,000 based on the parties' stipulation, and $58,946 in costs. CD Micro eventually filed a petition for bankruptcy and has not paid any part of this judgment. The bankruptcy trustee is prosecuting this claim against Unik for the benefit of the bankrupt estate of CD Micro. On July 8, 2003, I entered an opinion granting summary judgment in Symantec's favor against CD Micro and noting that all but five of the nearly 7,000 disks remaining in CD Micro's inventory were counterfeit. Unik sold over 15,000 disks in 22 sales after my ruling.

# DISCUSSION

I. <u>Symantec v. Unik</u>

The issue remaining for trial in Symantec's claim against Unik is Symantec's request for me to determine statutory damages for copyright infringement and trademark counterfeiting. Symantec seeks a maximum nonwillful statutory award of $100,000 for each of the six trademarks and $30,000 for each of the four copyrights, for a total of $720,000. Unik suggests an award of $2,000 for each of the six trademarks and $3,000 for each of the four copyrights, for a total award of $24,000. Symantec and Unik stipulated that Symantec's actual damages from Unik's sales of the copies of SystemWorks® software total $272,226.

When a party's trademark right is violated, the party may recover defendant's profits, any damages sustained by the plaintiff, and the costs of the action. According to the circumstances of the case, the court may enter judgment for any sum up to three times the actual damages. 15 U.S.C. § 1117(a). Moreover, for intentional use of a known counterfeit trademark, the court shall enter a judgment for three times the profits or damages under § 1117(a) unless the court finds extenuating circumstances. <u>Id.</u> § 1117(b). For use of a counterfeit mark, a plaintiff may elect to recover statutory damages rather than actual damages. <u>Id.</u> § 1117(c). Statutory damages are from $500 to $100,000 per counterfeit mark for nonwillful use or up to $1,000,000 per counterfeit mark for willful use. <u>Id.</u> § 1117(c)(1)-(2).

A copyright owner is entitled to recover actual damages suffered as a result of the infringement and any profits of the infringer that are attributable to the infringement. 17 U.S.C.§ 504(b). The copyright owner may elect to recover an award of statutory damages instead of actual damages and profits. <u>Id.</u> § 504(c)(1). Statutory damages are from $750 to

$30,000 per copyright for nonwillful infringement or up to $150,000 for willful infringement. Id. § 504(c)(1)-(2).

Copyright infringement and trademark infringement are two different wrongs which can at times be committed by a single act. This is not considered a double recovery. Further, the court may award statutory damages for copyright infringement and actual damages, possibly trebled, for trademark infringement. Nintendo of America, Inc. v. Dragon Pacific International, 40 F.3d 1007, 1011 (9th Cir. 1994), cert. denied, 515 U.S. 1107 (1995).

I find the cases discussing the infringement of software products more persuasive than infringement of other products. The following are summaries of several of the cases.

In Microsoft Corp. v. Logical Choice Computers, Inc., 2001 WL 58950 (N.D. Ill. 2001), defendants purchased Microsoft Windows 95 and Microsoft Office 97 (a suite of 5 programs) from unauthorized suppliers. Microsoft identified authorized suppliers in a Delivery Service Partner program in which defendant was registered. Defendant continued to purchase and distribute counterfeit software from unauthorized suppliers after receiving a cease and desist letter from Microsoft. Defendant sold at least 788 units but denied that it intentionally distributed counterfeit software. The court found defendant willfully blind to Microsoft's ownership rights because of the cease and desist letter, the low price of the software, and mysterious codes the suppliers used on their invoices rather than the Microsoft name for the product. The court awarded $200,000 for each of the seven trademarks infringed and $20,000 for each of the seven copyrights infringed, for a total of $1.54 million.

In Microsoft Corp. v. Black Cat Computer Wholesale, Inc., 269 F. Supp. 2d 118 (W.D.N.Y. 2002), defendants continued to distribute counterfeit software, including several

PAGE 7 - FINDINGS AND CONCLUSIONS

suites of software, after receiving two cease and desist letters from Microsoft and sold at least 8,922 units. Defendants appeared in the case but did not respond to Microsoft's summary judgment motion. The court found that defendants willfully infringed the copyrights and trademarks based on willful blindness. Microsoft only sought the maximum nonwillful statutory damages. The court awarded $510,000 in statutory damages for copyrights ($30,000 for each of 17 copyrights) and $900,000 for the trademarks ($90,000 for each of 10 trademarks).

In <u>Microsoft Corp. v. Compusource Distributors, Inc.</u>, 115 F. Supp. 2d 800 (E.D. Mich. 2000), Microsoft sent a cease and desist letter to defendant, who was registered in the Delivery System Partner program, causing its president to contact his two primary software suppliers who gave him verbal assurances that the software was legitimate and was bought from companies going out of business. Defendant then continued to sell the counterfeit software purchased from these unauthorized suppliers, selling 1,790 units. The court found that defendant was willfully blind based on the low prices, coded invoices, cease and desist letter, and purported Microsoft Certificates of Authenticity that were separately distributed from the software in violation of Microsoft's practice. Microsoft sought only the maximum nonwillful damages. The court awarded $50,000 for each of the eight trademarks and $15,000 for each of the nine copyrights, for a total award of $535,000.

Unik draws my attention to <u>Louis Vuitton Malletier v. Veit</u>, 211 F. Supp. 2d 567 (E.D. Pa. 2002). Plaintiffs owned trademarks on leather products, office products, sunglasses, and watches. Defendants did not appear in the action. The court found that they willfully infringed eight of the trademarks by continuing to sell the products after being sued. Unik relies on <u>Louis Vuitton</u> for the following:

PAGE 8 - FINDINGS AND CONCLUSIONS

> In similar cases concerning multiple marks, courts have been inclined to either award the maximum without multiplication or to lower the per mark award. See Rolex, 2002 WL 1226863, at *2; Playboy, 1998 WL 724000, at *8-9. I agree with this logic. While this case certainly calls for a high damage award, given the egregious conduct of the Defendants and the use of the internet, I conclude that a total award of $1,000,000 for the six Louis Vuitton marks [$166,666 each] and an award of $500,000 for the two Oakley marks [$250,000 each] ensures the dual objectives of compensating Plaintiffs and deterring Defendants.

Id. at 584-85.

Factors weighing against Unik include: (1) Unik continued to sell the product after being sued and after I ruled that nearly all disks in the CD Micro inventory were counterfeit; (2) the prices were low, even for the newer version of the product; (3) the software was not packaged as a retail product; (4) many of the invoices were coded; and (5) Unik did not check with Symantec about the authenticity of the disks. Balanced against that is the fact that Unik is a very small company which no longer engages in this type of business. After weighing the evidence and the parties' arguments, I award statutory damages of $60,000 for each of the six infringed trademarks and $15,000 for each of the four copyrights, for a total statutory damage award of $420,000.

II.     CD Micro v. Unik

   A.    Breach of Contract and Uniform Commercial Code ("UCC") Claims

CD Micro alleges that Unik breached its contract to sell SystemWorks® because it delivered unauthorized software. Based on my factual finding above that Webb expressly specified the markings he wanted printed on the hub ring, that Unik supplied disks with these markings, and that Webb approved the sample, I conclude that Unik sold CD Micro what it asked to purchase. Accordingly, I dismiss the breach of contract claim.

CD Micro's claim for breach of express warranty is based on ORS 72.3130(b): "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." The analysis is similar to the breach of contract claim, namely, that Unik sold the exact product that Webb specified. I also dismiss the breach of express warranty claim.

CD Micro also alleges a claim for breach of the warranty of title and infringement under ORS 72.3120. The statute states:

> (3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like, but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

ORS 72.3120(3). Because Webb furnished specifications to Unik, and Unik complied with the specifications, I also dismiss the claim for breach of warranty of title and infringement.

B.  Contractual Indemnity

CD Micro's claim for contractual indemnity is based on language in the purchase orders. The relevant language is:

> Vendor hereby agrees to indemnify and hold Purchaser and Purchaser's subsidiaries, affiliates, officers, directors, agents, and employees, harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of your breach of this Agreement or your violation of any law or the rights of a third party.

Ex. 8. Although I found that Unik did not breach the agreement, it did violate the rights of a third party, Symantec.

Unik first argues that this language indemnifies CD Micro from loss or damage but does not hold CD Micro harmless from liability, the situation CD Micro is in because it has not

PAGE 10 - FINDINGS AND CONCLUSIONS

satisfied the judgment against it. CD Micro argues that the plain meanings of claim, demand, or liability include one another.

Unik first relies on Willson v. McEvoy, 25 Cal. 169 (1864), which discusses Aberdeen v. Blackmar, 6 Hill 324 (N.Y. 1844). Willson rules in accordance with the

> rule at common law . . . , that on a bond to indemnify against the damage the obligee might sustain, he could recover only upon evidence that he had sustained actual damage; that compensation would be awarded only for actual loss. Evidence showing that he was subject to a liability, without showing payment, was not enough.

Willson, 25 Cal. at 172.

I think the analysis of Unik's duty to indemnify is better guided by an Oregon case cited by CD Micro, Blanchfill v. Better Builds, Inc., 160 Or. App. 527, 982 P.2d 53 (1999). Better Builds manufactured and leased exercise equipment to Cottage Grove Fitness ("CGF") and its owner, Blanchfill. The lease stated:

> The lessee [CGF] * * * agrees to defend, at lessee's own expense, any and all actions brought against either or both of the parties hereto for damages to persons or property caused by the leased property or by its operation, and agrees to hold lessor [Better Builds] free and harmless of and from any and all claims and demands that may arise or be occasioned to any person or to any property by or through the use of the leased property during the term of this lease or any renewal hereof.

Id. at 529-30 (emphasis removed). A person injured by the equipment sued Better Builds for negligence and strict liability and Better Builds sued CGF for contractual indemnity and contribution. Several amendments, cross claims, and counterclaims resulted in each of the three parties blaming the others for the accident, either singly or in combination. Id. at 531-32.

The court reviewed Oregon law concerning contractual indemnification.

PAGE 11 - FINDINGS AND CONCLUSIONS

In determining whether broad contractual "hold harmless" language entitles a party to be indemnified for the consequences of its own negligence, we apply the principles expressed in Layman, as supplemented by our analysis in Cook v. Southern Pac. Transp. Co., 50 Or App 547, 623 P2d 1125, rev den, 291 Or 1 (1981). If contractual language clearly and explicitly provides that a party will be indemnified for a particular loss, even if caused by that party's negligence, then the inquiry ends, and the provision is enforced. If, however, the contractual language is broad but indefinite – *e.g.*, referring to "any and all claims" or "any and all liability" without reference to particular risks or to the putative indemnitee's own conduct – the court determines the scope and enforceability of that language after assessing certain broader contextual considerations . . . .

Id. at 534 (internal quotations omitted). The court went on to coalesce the analyses in the two leading cases, Southern Pac. Co. v. Layman, 173 Or. 275, 145 P.2d 295 (1944), and Cook v. Southern Pac. Transp. Co., 50 Or. App. 547, 623 P.2d 1125 (1981).

Thus, read reasonably, Layman and Cook in combination require that, when a larger agreement includes broad indemnification language that does not specifically allocate the particular risk from which the liability arises, the court, in determining the scope and application of that language, is to consider at least the following factors:

– The parties' relative status, including their financial strength, their sophistication and appreciation of potential risks, and the dynamics of their bargaining, particularly whether the indemnification language was specifically negotiated.

– The extent to which the putative indemnitor's activities exposed the putative indemnitee to new or different liability, both generally and with respect to the particular risk – and, conversely, the extent to which the particular liability arose from circumstances, including the indemnitee's conduct, that were beyond the indemnitor's control.

– The putative indemnitor's reasonably anticipated benefit ("privilege" or "profit") under the agreement versus its concomitant potential exposure to liability for the indemnitee's conduct.

Id. at 540. After considering the factors, the court held that the trial court did not err in finding that the broad hold harmless language in the lease agreement did not obligate CGF to indemnify Better Builds. Id. at 543.

I first note that the indemnification language in the purchase order, "any claim or demand . . . arising out of . . . your violation of any law or the rights of a third party," is quite broad and does not explicitly provide for indemnification in case of infringement by CD Micro. Consequently, I will address the Layman/Cook factors.

Although both companies are relatively small businesses, CD Micro was an order of magnitude larger than Unik, which only had three to four employees. At least in this portion of their business, both companies were also relatively unsophisticated, acting primarily as middlemen in procuring software from a supplier and selling it unchanged to their customers. Both understood the risk that counterfeit software was being sold in the marketplace and both took limited precautions against distributing counterfeit software by making cursory inspections of disks they procured.

Although Webb testified that he did not discuss the indemnification language with Bagadia, I decline to believe him for the reasons explained above. Bagadia testified that when he questioned Webb about this language, Webb told him not to worry about it. Although I concluded in my summary judgment opinion that under the parol evidence rule, the written agreement superseded Webb's oral statement, I believe Webb's statement can reasonably be taken into account when balancing the factors here. Thus, the first factor weighs against requiring indemnification.

PAGE 13 - FINDINGS AND CONCLUSIONS

Unik's activities did not expose CD Micro to greater liability for infringement. This also weighs against requiring indemnification. Liability from infringement arose from circumstances that could have been controlled by either company. Both failed to contact Symantec to determine if the disks were authentic prior to reselling them. Both could have easily done so. This factor is neutral.

Unik's benefit under the agreement would be its profits. Its potential liability would be triple damages, or statutory damages that could range much higher, as well as attorney fees. That is more risk than a reasonable company would undertake for the benefit derived.

In summary, none of the factors weigh in favor of requiring indemnification and several factors weigh against it. I believe the most important point is that either company could have contacted Symantec and determined whether the software was authentic. Although both checked with others in the same business, the situation was one in which numerous people were selling infringing software while assuring each other that it was authentic. None of these people had the knowledge to make the assurance and none of them checked with the company who could tell conclusively, Symantec. There is no evidence that it would have been difficult to make this check. Once Symantec contacted CD Micro, and CD Micro provided sample disks, Symantec promptly responded that the disks were counterfeit. Either CD Micro or Unik could have prevented its own exposure. The indemnification clause put Unik at much greater financial risk than it expected to profit from the transaction. Consequently, I conclude that under the circumstances here, CD Micro is not entitled to the benefit of the contractual indemnity clause.

## SUMMARY

Symantec must elect between actual and statutory damages within 14 days. As discussed at trial, Symantec's entitlement to attorney fees will be determined separately. CD Micro must move for a default judgment against Softshop.com within 14 days and provide appropriate documentation supporting its claimed damages.

Dated this ___3rd___ day of May, 2005.

                                                    /s/ Garr M. King
                                                    Garr M. King
                                                    United States District Judge